## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

CASE NO. 11CR380 (DWF/TNL)

UNITED STATES OF AMERICA,

    Plaintiff,

v.            **REPORT & RECOMMENDATION**

CHRISTOPHER SHAWN ROBISON,

    Defendant.

Julie E. Allyn, Assistant United States Attorney, **UNITED STATES ATTORNEY'S OFFICE**, 316 N Robert Street, Suite 404, St Paul, MN 55101, for the United States; and

Manvir K. Atwal, **OFFICE OF THE FEDERAL DEFENDER**, 300 South 4th Street, Suite 107, Minneapolis, MN 55415.

### I.

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Docket No. 9); Motion to Suppress Statements, Admissions, and Answers (Docket No. 10); and Motion to Dismiss Indictment: Lack of Nexus with Interstate Commerce (Docket No. 11). These matters have been referred to this Court for report and recommendation under 28 U.S.C. § 636 and Local Rule 72.2(b).

On February 9, 2012, a hearing was held on the motions; Crow Wing County Sheriff's Investigator Donald Downie, Detective Chad Nelson of the Willmar Police

Department, and Detective Sergeant Vince King of the Willmar Police Department testified; and evidence was received.[1]   Assistant United States Attorney Julie E. Allyn appeared on behalf of the United States of America (Government).   Douglas Olson appeared on behalf of Defendant.   For the reasons set forth herein, this Court recommends that Defendant's motions be denied.

II.

Based upon the file and documents contained therein, along with testimony and exhibits presented at hearing, the undersigned Magistrate Judge makes the following:

**FINDINGS**

## A. The Investigation

On February 18, 2011, Crow Wing County Sheriff's Investigator Donald Downie checked the "Casual Encounters" area of Craigslist website and discovered that on February 17, 2011, someone posted an advertisement titled: "Looking for young, the younger the better." Hearing Transcript 9:4, 12:8-16, Feb. 9, 2012; Docket No. 21. Sheriff's Investigator Downie used a fictitious internet account—which portrayed the adult male Sheriff's Investigator as a 13-year-old female, named "Amber"—to contact the advertiser. Hr. Tr. 13:1-10.   Sheriff's Investigator Downie's undercover persona, "Amber," subsequently received an e-mail from Amy****@yahoo.com. Hr. Tr. 13:6-23.

---

[1] The Government's Exhibits were as follows: Exhibit 1 (DVD video recording from July 27, 2011); Exhibit 2 (transcript from audio recording from July 27, 2011); Exhibit 3 (search warrant from July 27, 2011); Exhibit 4 (DVD video recording from July 28, 2011); Exhibit 5 (transcript from interrogation audio recording from July 28, 2011); Exhibit 6 (search warrant and application from July 29, 2011); and Exhibit 7 (consent to search form).

The e-mail was signed "AmyR," who represented that she was writing on behalf of herself and her boyfriend, "Chris." Hr. Tr. 14:14-17. "Amber" subsequently received other communications from the Amy****@yahoo.com e-mail and "AmyR" that were "sexual in nature" and expressing an interest in "getting together." Hr. Tr. 14:1-6. "Amber" communicated to "AmyR" several times that she was 13 years old. Hr. Tr. 14:8-10.

Later, on February 18, 2011, "Amber" was contacted via instant messaging by Robi****@yahoo.com, who "represented [himself] as Chris Robison," the Defendant. Hr. Tr. 14:22-15:1; 16:15-17:4. On February 18, "Amber" sent Defendant pictures of a 14-year-old girl and represented that the pictures were of her. Hr. Tr. 18:1-8. "Amber" also conversed with Defendant via instant messaging on February 22 and March 24, 2011. Hr. Tr. 15:15-19. During these conversations, Defendant asked "Amber" questions of a sexual nature and proposed visiting "Amber" when her mother was away and engaging in oral sex and vaginal intercourse with "Amber." Hr. Tr. 17:12-25. On February 22, 2011, "Amber" also received a picture of a man's penis from Defendant. Hr. Tr. 18:18-24. During this period, Defendant also contacted "Amber" six times when "Amber" was offline (i.e., not online for real time instant messaging or Facebook communications). Hr. Tr. 15:17-16:3.

"Amber" had no further communications with Defendant until July 2011. Hr. Tr. 19:4-6. From March 24, 2011 through June 2011, Defendant sent "Amber" offline messages periodically and these messages got more frequent towards the end of June 2011. Hr. Tr. 19:11-19. In July 2011, "Amber" had a conversation with Defendant via

Facebook.[2]  Hr. Tr. 19:18-20:12.  Defendant stated that he was "from the Willmar area." Hr. Tr. 20:7-8. Sheriff's Investigator Downie used the Minnesota Department of Motor Vehicle records to locate a "Chris Robison" who lived in Willmar, Minnesota, and to match Chris Robison's driver's license photograph with the photographs that Sheriff's Investigator Downie observed on Defendant's Facebook webpage.  Hr. Tr. 20:7-12. Sheriff's Investigator Downie also used the Minnesota Department of Motor Vehicle records to confirm that the make and model of Chris Robison's automobile matched the vehicle that was described to "Amber." Hr. Tr. 20:7-12.

Thereafter, Sheriff's Investigator Downie sent an administrative subpoena to Yahoo and he learned that the Yahoo accounts communicating with "Amber" were using the RIM or Blackberry network. Hr. Tr. 21:7-17. Based upon this information, Sheriff's Investigator Downie knew that the messages sent to "Amber" were being sent via cellular phone with internet access. Hr. Tr. 21:17-23. But, Sheriff's Investigator Downie's administrative subpoena to the RIM network could not pinpoint a specific user. Hr. Tr. 24:1-3.

Based upon all of the aforementioned information, Sheriff's Investigator Downie believed that Defendant was in violation of a Minnesota statute that prohibits having

---

[2] On February 18, 2011, Defendant befriended "Amber" through Facebook, which permitted Sheriff's Investigator Downie to view Defendant Chris Robison's name and photo on his Facebook account. Hr. Tr. 19:22-20:6.

communications of a sexual nature with minors over the internet[3] and, therefore, he decided to attempt to interview Defendant.

### B.  July 27, 2011 Statement

On July 27, 2011, Sheriff's Investigator Downie and another investigator drove to Willmar, Minnesota and met with Detective Sergeant Vince King of the Willmar Police Department. Hr. Tr. 26:2-11.   Detective Sergeant King and many law enforcement officers in Willmar were familiar with Defendant, in part, because he worked for a local towing company that occasionally contracted with the Willmar Police Department. Hr. Tr. 26:2-14; *see also* Hr. Tr. 66:16-67:19; Hr. Tr. 84:13-9.

After Sheriff's Investigator Downie arrived in Willmar, Detective Sergeant King called Defendant's cellular telephone. Hr. Tr. 26:3-6. Defendant did not answer, but Defendant called Detective Sergeant King back after ten minutes. Hr. Tr. 26:21-25; Hr. Tr. 86:1-5. Detective Sergeant King told Defendant that he "had a couple of detectives from Crow Wing County that would like to have him come in and talk to him about a case." Hr. Tr. 86:1-8; *see also* Hr. Tr. 27:2-8. Defendant asked Detective Sergeant King what they wanted to talk about and Detective Sergeant King "explained that [he] would rather have them talk to him about that. And he was okay with that. He was willing to come in, but he said he didn't have [a] license, so [Detective Sergeant King] offered to go pick him up and give him a ride back." Hr. Tr. 86:6-13; *see also* Hr. Tr. 27:2-8; Hr. Tr. 29:3-5. Detective Sergeant King told Defendant that the statement would be voluntary

---

[3] Sheriff's Investigator Downie could not cite the specific statute in question. This Court presumes that the statute is Minn. Stat. § 609.352.

and he "guaranteed to [Defendant] on the phone that he would be going home that evening." Hr. Tr. 86:17-21.

Detective Sergeant King gave Defendant a ride from his residence to the Willmar Law Enforcement Center, which was an approximately one- to two-mile journey. Hr. Tr. 86:22-87:6, 89:10-13; *see also* Hr. Tr. 27:9-10. When Detective Sergeant King arrived at Defendant's residence, Defendant was waiting outside and approached Detective Sergeant King's unmarked squad car and took a seat in the front passenger seat.  Hr. Tr. 87:11-21.  Defendant asked again what the officers from Crow Wing County wanted to speak with him about and Detective Sergeant King told him again that he could get that information from them. Hr. Tr. 87:18-22. Defendant was never handcuffed and had unrestricted movement during the drive. Hr. Tr. 88:12-19.  During the drive, they talked about "general topics," and Defendant sent text messages through his cellular telephone. Hr. Tr. 87:18-88:22.

Once at the Law Enforcement Center, Detective Sergeant King parked in the back of the building, walked Defendant in through the back door, and walked with Defendant into an interview room. Hr. tr. 88:23-89:9.  Sheriff's Investigator Downie described the room as follows: "It is a room, probably 10 by 10, has a one-way mirror on what I would consider to be the west wall. The door to enter the room is on the east wall.  It has a table and some chairs in it."  Hr. Tr. 28:12-15; *see also* Hr. Tr. 89:16-21.

After Detective Sergeant King left the room, Defendant took the chair closest to the door. Hr. Tr. 28:15-16; *see also* Hr. Tr. 13-14. The door was not locked. Hr. Tr. 28:16-18; *see also* Hr. Tr. 29:16-17. When Sheriff's Investigator Downie entered the

room, he sat across from the table from Defendant. Hr. Tr. 28:12:19; Gov't Ex. 1. The interview commenced at 10:35 a.m. Gov't Ex. 1, 2.  The interview was recorded by an audio recorder and a video recorder, each with a separate audio track. Hr. Tr. 44:23-45:5; *see* Gov't Ex. 1; Gov't Ex. 2. Government Exhibit 2 is a transcript of the audio track from the audio recorder. The transcript does not include page 24, but the audio track from the video is discernible and covers the period of conversation presumably covered by page 24. Likewise, at approximately 46 minutes and 25 seconds into the interview, Sheriff's Investigator Downie turned off his tape recorder to leave the room and speak with his partner, but the audio track on the video recorded the following exchange:

> DEFENDANT: Am I still free to go?
>
> INVESTIGATOR: I didn't lie to you Chris. Can you just hang tight so I can talk to my partner?
>
> DEFENDANT: Yeah.

Gov't Ex. 1. After the interview was complete approximately one hour later, the video also captures a conversation between Defendant and Sheriff's Investigator Downie concerning Defendant's cellular telephone. Gov't Ex. 1. In the video, Sheriff's Investigator Downie asked Defendant for the password for his cellular telephone and Defendant appears to draw the password pattern for Sheriff's Investigator Downie. Gov't Ex. 1.

At no time on July 27, 2011, was Defendant fingerprinted. Hr. Tr. 28:23-24. The door to the interview room was never locked. Hr. Tr. 28:16-18; *see also* Hr. Tr. 29:16-17; Hr. Tr. 89:22-90:10. Defendant's movement was never restricted, and Defendant was

never handcuffed. Hr. Tr. 32:4-9. Sheriff's Investigator Downie wore plain clothes and never brandished his weapon. Hr. Tr. 32:15-19.   Sheriff's Investigator Downie spoke in a conversational tone and did not yell, swear, or make any threats. Hr. Tr. 32:20-25.

At the beginning of the interview, Sheriff's Investigator Downie confirmed that Defendant understood that he was not under arrest or in custody, Gov't Ex. 2, at 1, 2, and that Sheriff's Investigator Downie was not going to place him under arrest. Gov't Ex. 2, at 2; Hr. Tr. 30:12-18; *see also* Hr. Tr. 31:1-10. Sheriff's Investigator Downie also confirmed that Defendant understood that he did not have to talk with Sheriff's Investigator Downie. Gov't Ex. 2, at 2; Hr. Tr. 31:11-18. Defendant was free to leave at all times.

During the interview, Defendant told Sheriff's Investigator Downie that he was communicating with a 13-year-old girl in Brainerd, named "Amber," and that he communicated with her using his cellular telephone, the "AmyR****" and "Robi****" yahoo accounts, and Facebook. Gov't Ex. 2, at 10; Hr. Tr. 34:4-17. Defendant told Sheriff's Investigator Downie that he had currently had a Motorola Android cellular telephone and he previously had a Blackberry cellular telephone; both were able to access the internet. Gov't Ex. 2, at 8-9. Defendant said that he discarded his Blackberry cellular telephone approximately one and one half months ago, Gov't Ex. 2, at 9 and 18, and he had been using his Motorola Android cellular telephone for the last month. Hr. Tr. 34:16-35:1. Defendant reported that he had the same phone number for each phone. Hr. Tr. 35:5-10. Defendant also reported that he used a laptop computer to access Facebook. Gov't Ex. 2, at 9.

During the conversation, the following exchange occurred:

> DEFENDANT: I sent some pictures of Amy and pictures of myself.

> INVESTIGATOR: Okay? What, pictures of Amy?

> DEFENDANT: I think some of her, being clothed and, I think I need to have a lawyer here. I just come, nervous to be honest with ya.

> INVESTIGATOR: Okay.

> DEFENDANT: I'm just, I, I, I want you to be forward with me. Am I, screwed?

> INVESTIGATOR: I, I'm, have been forward with you the entire time.

> DEFENDANT: I know.

> INVESTIGATOR: This isn't gonna be, are you, are you looking at a crime? Obviously you are, otherwise I wouldn't, you wouldn't have a law enforcement officer talking to you.

> DEFENDANT: Right.

> INVESTIGATOR: You're not gonna get arrested today.

> DEFENDANT: Not today but I am gonna get arrested.

> . . . .

> INVESTIGATOR:  . . .  I will provide everything to the County Attorney and the County Attorney will decide whether or not you'll get charged. . . .

> DEFENDANT Cuz I'm, trying to be as, I'm being honest with you here and everything cuz, I don't wanna.

> INVESTIGATOR: Yup. Um.

> DEFENDANT: I'm just, I'm sorry.

INVESTIGATOR: You wanna talk to an attorney and, usually when someone tells me that that's where I stop, talking to people?

DEFENDANT: Well just, I guess what I'm trying to say is, I'm gonna lose my kids, whatnot I have, out of this deal.

INVESTIGATOR: You would?

DEFENDANT: Yah.

INVESTIGATOR: Why is that?

DEFENDANT: She'll take her attorney to court with me and just, boom I'm done.

INVESTIGATOR: How does she know that you get in trouble[?]

DEFENDANT: If I get charge she's gonna know.

INVESTIGATOR: Oh.

DEFENDANT: And I know I'm gonna get charged.

INVESTIGATOR: Okay?

DEFENDANT: But I just, and you wouldn't be here, doing this investigation and everything.  It's like, I'm, I'm being honest with you, on everything.  I just, I just don't know what to do. I'm just so down in life right now that, (sighs – pause, tapping sounds) it's been bad lately.   My life, is (indiscernible). I can't find work. My child support's, through the roof. (sighs) It's hard to wake up every day.

INVESTIGATOR: Um-huh. Yah you seem pretty depressed. (indiscernible)

DEFENDANT: Let's keep going. I guess, let's do this and be done with it.

INVESTIGATOR: It's up to you.

DEFENDANT: (coughs)

INVESTIGATOR: Just, to make sure you're okay with it. . . .

Gov't Ex. 2, at 15-16. Sheriff's Investigator Downie then explained the nature of his work as an investigator within the context of the judicial system with Defendant frequently stating "Yup," "Ya" or "Yah" and "Right" in response to Sheriff's Investigator Downie's statements. Gov't Ex. 2, at 16-17. Sheriff's Investigator Downie then explained that it was a crime to communicate with a minor over the internet about sexual things and that it was a felony level offense. Gov't Ex. 2, at 17. Then Sheriff's Investigator Downie asked, "Okay? Um, so it's up to you. Do you wanna keep talking about it? Or not. If you wanna, if you wanna talk to an attorney you can certainly do that too." Gov't Ex. 2, at 17. Defendant responded, "Let's keep going." Gov't Ex. 2, at 18. Thereafter, Sheriff's Investigator Downie stated that if there was any question that Defendant did not want to answer he could say that he did not want to answer. Gov't Ex. 2, at 18.

Thereafter, Defendant confirmed that he sent "Amber" communications of a sexual nature and a picture of his penis. Gov't Ex. 2, at 19; Hr. Tr. 36:11-19. Defendant also stated that he was remorseful and desired to write an apology letter. Gov't Ex. 2, at 28-29.  Sheriff's Investigator Downie concluded the interview and Defendant asked, "Am I still going to be free to go?" Hr. Tr. 39:14. Sheriff's Investigator Downie confirmed that Defendant was not under arrest. Hr. Tr. 39:14-40:1. Defendant asked, "Can, can I call, an attorney, please?"  Gov't Ex. 2, at 28; Tr. 39:22-40:3. Sheriff's Investigator Downie stated: "You sure can. At any point you can talk to an attorney." Gov't Ex. 2, at 28.

Sheriff's Investigator Downie stated that Defendant could not use his Motorola Android cellular telephone to call, but offered Defendant his own cellular telephone to use. Gov't Ex. 2, at 29; Hr. Tr. 39:22-40:3. Defendant asked if he could call his girlfriend and Sheriff's Investigator Downie told him that he could call whoever he wanted after they have secured his residence. Gov't Ex. 2, at 29; Hr. Tr. 40:2-10. Defendant agreed to receiving a ride from Sheriff's Investigator Downie's partner. Hr. Tr. 43:2-5; *see also* Hr. Tr. 42:17-23.

Sheriff's Investigator Downie testified at the hearing that cellular telephones use an SD card, which stores media, including images and e-mail messages. Hr. Tr. 35:11. SD cards can be switched from phone to phone "[v]ery easily." Hr. Tr. 36:1-3. Specifically, an SD card can be taken from a Blackberry telephone and placed into a Motorola Android telephone. Hr. Tr. 36:4-10. Sheriff's Investigator Downie testified that he seized Defendant's Motorola Android cellular telephone at the end of the interview because "cell phones are very, very fragile as far as the evidence . . . [or] the information they contain," telephone companies offer the ability to remotely wipe all of the data from a cellular telephone, and because of their size, cellular telephones and SD cards can be easily destroyed. Hr. Tr. 40:2-41:5. Sheriff's Investigator Downie also believed that Defendant's Motorola Android cellular telephone had evidence of a crime. Hr. Tr. 41:3-25.

After the interview, Sheriff's Investigator Downie's partner drove Defendant to his residence, and when they were at Defendant's residence, Defendant was provided with a cellular telephone, which he used to call his girlfriend and an attorney. Hr. Tr.

58:21-59:11. While Sheriff's Investigator Downie's partner secured Defendant's residence by standing in the driveway, Defendant walked freely around the residence. Hr. Tr. 59:8-23.

### C. July 27, 2011 Search Warrant

After the interview was complete, Sheriff's Investigator Downie added some information obtained from the interview into his search warrant application and brought the application to the Honorable Michael J. Thompson, "a duly assigned Judge in good standing" in Kandiyohi County, Minnesota. Hr. Tr. 46:15-47:15. Judge Thompson signed the warrant at noon on July 27, 2011. Hr. Tr. 47:23-24; Gov't Ex. 3.

The Application for Search Warrant and Supporting Affidavit (Gov't Ex. 3) described the property and things to be searched as documentation and records concerning pornographic images, discussions by robi****@yahoo.com or amy****@yahoo.com about child pornographic images, and discussions by robi****@yahoo.com or amy****@yahoo.com with any juveniles for the purpose of sexual contact. Gov't Ex. 3. The premises and person to be searched were a specific residence at Trott Avenue SW, in Willmar, Minnesota, and Defendant Christopher Shawn Robison. *Id.* The supporting affidavit by Sheriff's Investigator Downie described the Craig's List advertisement, the e-mail exchanges between "Amy" and "Amber," the statements made to Amber that were of a sexual nature, the "friend request" via Facebook to "Amber" from "Chris Robison," the instant messaging communications between "Amber" and Defendant, the administrative subpoenas, the Department of Motor Vehicle records search, and the interview from July 27, 2011. *Id.* The search was conducted on

July 27, 2011, at 12:24 p.m., and Defendant's Motorola Android cellular telephone and a HP Laptop Computer were ultimately seized.

Sheriff's Investigator Downie searched Defendant's Motorola Android cellular telephone later on the night of July 27, 2011. Hr. Tr. 48:21-49:5; *see also* Gov't Ex. 3. Sheriff's Investigator Downie's search of Defendant's Motorola Android cellular telephone revealed images that based on his training and experience he had reason to believe were pornographic photographs of a child. Hr. Tr. 49:20-25. Sheriff's Investigator Downie forwarded that information obtained from Defendant's Motorola Android cellular telephone to the Willmar Police Department. Hr. Tr. 67:24-68:2; Hr. Tr. 92:17-94:18.

### D. July 28, 2011 Statement

With the assistance of a Kandiyohi County Sheriff's Deputy who was already "friends" with Defendant on Facebook, Willmar Police Detective Chad Nelson compared the images forward by Sheriff's Investigator Downie with pictures posted on Defendant's Facebook account and determine the identity of the female child in the photographs identified by Sheriff's Investigator Downie.  Hr. Tr. 67:24-69:4; *see also* Hr. Tr. 94:8-18. Using global positioning system information forwarded by Sheriff's Investigator Downie, Willmar Police Detective Nelson located a park five miles away from Willmar, in Kandiyohi County, where the pornographic pictures were taken. Hr. Tr. 69:2-14; *see also* Hr. Tr. 94:8-18.

Thereafter, at 2:55 p.m., on July 28, 2011, Willmar Police Detective Nelson and Sergeant Detective King arrested Defendant at his residence. Hr. Tr. 69:19-70:18; *see*

*also* Hr. Tr. 94:19-21.   They transported Defendant to the Willmar Law Enforcement Center, brought him to the interview room used on July 27, informed him that he was in custody, read him his *Miranda*[4] rights, confirmed that he understood his rights, and confirmed that he was willing to speak with them. Gov't Ex. 5, at 5; Hr. Tr. 70:16-72:3; *see also* Hr. Tr. 94:22-96:4.   Defendant was then interviewed. *See generally* Gov't Ex. 5. During the interview he confessed to taking pornographic images of his daughter. *See generally* Gov't Ex. 5; Hr. Tr. 75:23. At the conclusion of the interview, Defendant confirmed again that he was read his *Miranda* rights, his statements were made of his own free will, and that the officers "treat[ed him] right." Gov't Ex. 5, at 24. Defendant stated that he was "not good" "mentally" and he preferred that the officers put him on a suicide watch. Gov't Ex. 5, at 24-25.   At no time during the interview did Defendant appear to Willmar Police Detective Nelson to be under the influence of narcotics or alcohol, confused by the questions, or coerced. Hr. Tr. 71:23-72:23; *see also* Hr. Tr. 94:22-96:4.   Willmar Police Detective Nelson did not yell at or threaten Defendant and, to the best of his knowledge, Defendant's statement freely and voluntarily given. Hr. Tr. 72:13-25; *see also* Hr. Tr. 94:22-96:4.

Government Exhibit 4 is a video recording from the interrogation from July 28, 2011.  Government Exhibit 5 is a transcript of a recording from the arrest and a transcript of interrogation.

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966).

**E.  July 28, 2011 Search**

After the interview, Willmar Police Detective Nelson and Detective Sergeant King returned to Defendant's residence, and ask Defendant's girlfriend—who was the owner of the residence—if she would sign a consent-to-search form.  Hr. Tr. 76:3-13. She signed the form. Hr. Tr. 76:18-19; *see also* Gov't Ex. 7.  Thereafter, they took digital photographs of the exterior of the residence and the interior of the master bedroom. Hr. Tr. 76:16-22.  While taking pictures the officers noticed some bedding that also appeared in the photographs forwarded by Sheriff's Investigator Downie. Hr. Tr. 77:23-78:7.

**F.  July 29, 2011 Search Warrant**

On July 29, 2011, Willmar Police Detective Nelson prepared an Application for Search Warrant and Supporting Affidavit and brought the application to Judge Thompson.   Hr. Tr. 77:20-79:13; Gov't Ex. 6. The Application described that the property and things to be searched for, including computer systems, media, papers and effects that tend to show the possession or distribution of child pornography or the online enticement of children, depictions of minors engaged in, or simulating, prohibited sexual acts, depictions of nudity involving minors, any evidence related to the exploitation of children, and a "pokka dotted fitted sheet." Gov't Ex. 6. The premises to be searched were described as specific address on Trott Avenue SW, Willmar, County of Kandiyohi, Minnesota. *Id.* The affidavit described Sheriff Detective Downie's investigation, the July 27, 2011 interview, the pictures found by Sheriff Detective Downie on Defendant's Motorola Android cellular telephone, and the consented search from July 28, 2011. *Id.*

On July 29, 2011, Judge Thompson reviewed the warrant application and signed the search warrant in Willmar Police Detective Nelson's presence. Hr. Tr. 78:19-79:2. Nevertheless, on page seven of the application, Judge Thompson put the date as "April 29." Hr. Tr. 80:10-25; Gov't Ex. 6. Judge Thompson dated the actual search warrant as "July 29, 2011." Hr. Tr. 81:1-10. After the search warrant was reviewed and signed by Judge Thompson, Willmar Police Detective Nelson executed the warrant, "rely[ing] on good faith that the search warrant was a valid search warrant." Hr. Tr. 79:1-13. The search recovered a red Samsung cellular telephone, letters from Defendant, a receipt of Defendant, and a 2 GB SD card from a Kodak digital camera. Gov't Ex. 6.

### G. Indictment

Defendant was indicted by grand jury on December 20, 2011, of one count of production of child pornography, in violation of 18 U.S.C. §§ 2251(a), 2251(e), and 2253(a). *See* Docket No. 1. The Indictment charges that, on or about July 22, 2011, Defendant did employ, use, persuade, induce, entice, and coerce S.J.R., a minor, to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, which visual depiction was produced using materials that had been mailed, shipped, and transported in interstate commerce, including but not limited to, a Motorola Android cellular telephone. *Id.*

III.

Based upon the foregoing Findings, the undersigned Magistrate Judge makes the following:

## CONCLUSIONS OF LAW

### A. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Docket No. 9)

Defendant moves to suppress evidence obtained as a result of search and seizure, arguing (1) the search warrants for the searches on July 27 and 28, 2011 at the home located on Trott Avenue SW were issued without a sufficient showing of probable cause; (2) Defendant's Motorola Android cellular telephone was illegally seized prior to a search warrant being issued and without exigent circumstances warranting the seizure; and (3) Defendant's Motorola Android cellular telephone was illegally searched based on details Defendant gave during an illegal interrogation. For the reasons set forth below, this Court recommends that Defendant's motion be denied.

### 1. Search Warrants

Warrantless searches "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). "The ordinary sanction for police violation of Fourth Amendment limitations has long been suppression of the evidentiary fruits of the transgression." *United States v. Fiorito*, 640 F.3d 338, 345 (8th Cir. 2011).

"To be valid under the Fourth Amendment, a search warrant must be supported by a showing of probable cause." *United States v. Summage*, 481 F.3d 1075, 1077 (8th Cir.

2007). The Court considers "the totality of the circumstances to determine whether an [supporting] affidavit is sufficient to demonstrate probable cause." *United States v. Keele*, 589 F.3d 940, 943 (8th Cir. 2009). "Probable cause exists if the warrant application and affidavit describe circumstances showing a fair probability that contraband or evidence of a crime will be found in a particular place . . . ." *United States v. Montes–Medina*, 570 F.3d 1052, 1059 (8th Cir. 2009). "[T]he duty of a reviewing court is simply to ensure that the judge had a substantial basis for concluding that probable cause existed." *United States v. White*, 356 F.3d 865, 869 (8th Cir. 2004).

In the present case, the two warrant applications sufficiently recite facts to demonstrate probable cause that a crime was committed by Defendant at the location to be searched. The two warrants describe with particularity the place and persons to be searched and the items to be seized, and the nexus between the place, the items, and offense. The Motorola Android cellular telephone was actually searched pursuant to the July 27, 2011 warrant; therefore, the search of the contents of the Motorola Android cellular telephone was reasonable. The fact that July 29, 2011 warrant application is misdated does not render the warrant invalid. *Cf. United States v. Thomas*, 263 F.3d 805, 806 (8th Cir.2001); *White*, 356 F.3d at 869.

### 2.  Motorola Android Cellular Telephone

Defendant moves to suppress the seizure of his Motorola Android cellular telephone.  The Government concedes that the Motorola Android cellular telephone was *initially* seized without Defendant's consent or a search warrant at the conclusion of the July 27, 2011 interrogation; however, the Government argues that the temporary seizure

of the Motorola Android cellular telephone, at the end of the interrogation and prior to the issuance of the search warrant, was reasonable because exigent circumstances existed. This Court agrees.

Where law enforcement authorities have probable cause to believe personal property "holds contraband or evidence of a crime, but have not secured a warrant, the Court has interpreted the Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present." *United States v. Place*, 462 U.S. 696, 701, 103 S. Ct. 2637, 2641 (1983). Likewise, the temporary seizure of a person is reasonable, and hence lawful, where officers "had probable cause to believe that a home contained evidence of a crime and contraband," "the police had good reason to fear that, unless restrained, [the person] would destroy the drugs before they could return with a warrant," "the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy," and "the police imposed the restraint for a limited period of time." *Illinois v. McArthur*, 531 U.S. 326, 332-33, 121 S.Ct. 946, 950-51 (2001).

Defendant argues that no exigencies were present because the investigation began in February of 2011; the interview was not conducted until the end of July of 2011; Defendant told the officer he no longer had the Blackberry cellular telephone; Defendant could have destroyed evidence before the interview; the officers had no plans to place Defendant under arrest; and Defendant gave the officer no reason to believe that he would destroy evidence. This Court disagrees.

Based upon the particularized facts in the present case, this Court concludes that the temporary seizure of Defendant's telephone was reasonable. First, based on Defendant's statements and the officer's knowledge of cellular telephone technology, the officer had probable cause to believe that Defendant's Motorola Android cellular telephone contained evidence that Defendant violated Minn. Stat. § 609.352. Second, based upon the officer's training and experience, the officer could reasonable assume that exigent circumstances existed to seize temporarily Defendant's Motorola Android cellular telephone because Defendant could easily have destroyed the information contained within the telephone or could have used the telephone to call someone to destroy evidence at his residence. In addition to the nature of cellular telephones, the officer knew that prior to the interview on July 27, 2011, Defendant did not know that he was being investigated for committing a felony; until Defendant arrived to be interviewed, Defendant was only told that officers wanted to speak with him; and Defendant stated in the interview that he was ashamed and he was concerned about what would happen to his parental rights when his former spouse learned about the investigation or charges against him.  All of these factors would have suggested to the officer that Defendant's Motorola Android cellular telephone was at imminent risk of being destroyed.

Third, the officer balanced the interests of law enforcement and the interests of privacy by offering his own cellular telephone for Defendant to call an attorney and by providing Defendant with a ride to his residence and then providing him with telephone to call his girlfriend. Finally, the telephone was only seized for less than one hour and

Defendant was not permitted to enter his house for less than one hour, while the officer obtained a search warrant. For all of these reasons the Court concludes that the temporary seizure of the Motorola Android cellular telephone was not unreasonable and did not violated Defendant's rights under the Fourth Amendment.

The Motorola Android cellular telephone was named in the July 27, 2011 search warrant, and was searched pursuant to the issuance of that warrant. Therefore, the search of the Motorola Android cellular telephone falls within the purview of the search warrant analysis above.

**B.  Motion to Suppress Statements, Admissions, and Answers (Docket No. 10)**

Defendant next moves to suppress the statements made by him on July 27 and 28, 2011, arguing (1) the first statement was made while Defendant was in custody, without the benefit of a *Miranda* warning, and in violation of Defendant's right to counsel; and (2) the second statement made by Defendant was not freely and voluntarily given, thereby violating Defendant's rights under the Fourth Amendment and Fifth Amendment to the Constitution of the United States.   For the reasons set forth below, this Court recommends that that Defendant's motion be denied.

Prior to questioning a suspect within the context of a custodial interrogation, "a suspect must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  *J.D.B. v. North Carolina*, __ U.S. __, __, 131 S. Ct. 2394, 2401 (2011) (quotation omitted); *Miranda v. Arizona*, 384 U.S. 436, 444-445, 86 S. Ct. 1602, 1612 (1966).  A "custodial interrogation" means "questioning initiated by

law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612.   To determine whether a suspect is in custody, a court must consider "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517 (1983) (per curiam) (internal quotation omitted). "The custody inquiry turns on whether, given the totality of the circumstances, a reasonable person would have felt at liberty to terminate the interrogation and leave or cause the agents to leave."[5] *United States v. Vinton*, 631 F.3d 476, 481 (8th Cir. 2011).

If a suspect is not in custody, the suspect does not have a Fifth Amendment right to counsel. *United States v. Fitterer*, 710 F.2d 1328, 1333 (8th Cir. 1983). If a suspect is in custody and is apprised of the four rights annunciated in *Miranda*, "[t]he [suspect] may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. . . ." *Miranda*, 384 U.S. at 444-445, 86 S. Ct. at 1612.

Regardless of whether a suspect is interrogated within the custodial or noncustodial context, the "voluntariness" of the questioning "is a legal question requiring independent federal determination." *Miller v. Fenton*, 474 U.S. 104, 110, 106 S. Ct. 445,

---

[5] The Eighth Circuit Court of appeals has annunciated a non-exhaustive set of factors that are common to determining whether an individual is in custody. *See United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990).

449 (1985). "A confession violates a defendant's right to due process only if it is involuntary. 'The test for determining the voluntariness of a confession is whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will.'"   *United States v. Aldridge*, 664 F.3d 705, 711 (8th Cir. 2011) (quoting *United States v. Carlson*, 613 F.3d 813, 817 (8th Cir.2010)).

### 1.  July 27, 2011 Statement

Based on the totality of circumstances, Defendant's July 27, 2011 statement was made voluntarily and within the context of a noncustodial interrogation. This Court highlights the following facts as weighing significantly in the Court's determination: Defendant is an adult male who is sophisticated enough to utilize various electronic devices and social media programs. Defendant returned the officer's telephone call, agreed to speak with the officers at the police station, agreed to a ride from the officer, voluntarily entered the officer's automobile, and voluntarily entered the police station and the interrogation room.  During Defendant's entire interaction with officers on July 27, 2011, he was repeatedly told that he was not under arrest and he was free to not speak with the officers.  Defendant twice stated that he wished to continue with the interview after the officer. The interrogation was only approximately one hour in length. The officer maintained a conversational tone and did not threaten Defendant. At all times during the interrogation Defendant tracked the questions and answered appropriately. At no time during the interrogation was Defendant's ability to move restricted or restrained.

The fact that the interrogation occurred in the same room at the police station used for the July 28, 2011 custodial interrogation does not render Defendant in custody on July

27, 2011. *Cf. Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 714 (1977) (noting that *Miranda* warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect"). The fact that Defendant did not drive himself to the police department and expected a ride home from officers did not render the interrogation custodial.  *See United States v. LeBrun*, 363 F.3d 715, 722 (8th Cir. 2004) (en banc) (holding that a defendant was not in custody where agents gave defendant a ride to and from the police station for questioning); *see also United States v. Muhlenbruch*, 634 F.3d 987, 997 (8th Cir. 2011). This is even more so in the specific context of this case where Defendant was familiar with the local police officers from his work towing vehicles from time to time for the police department.  The fact that Defendant's Motorola Android cellular telephone was seized at the conclusion of the interview and that Defendant was told he could not call his girlfriend until they had secured his residence did not render Defendant in custody. *Cf. Muhlenbruch*, *634 F.3d at 997* (holding that a defendant was not in custody for the purposes of the interrogation when he was told at the conclusion of the interrogation that he could not go until the officers secured a search warrant).

Defendant argues that the officer should have ceased talking to him once he discussed wanting to contact an attorney.  A "suspect must unambiguously request counsel" and "he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355 (1994).   Defendant's statements during the interrogation on July 27, 2011,

concerning an attorney were ambiguous and the officer's inquiry into the ambiguity confirms that Defendant assented to proceed with the interrogation without the assistance of counsel.  Moreover, because Defendant was not in custody on July 27, 2011, at the time of his interrogation, his right to counsel under the Fifth Amendment was not implicated. Therefore, the officer did not violate Defendant's Fifth Amendment right to counsel by continuing to question Defendant.

### 2.  July 28, 2011 Statement

After considering the totality of the circumstances, this Court concludes that Defendant's July 28, 2011 statement was made within the context of a custodial interrogation; Defendant was apprised of his rights pursuant to *Miranda*; and Defendant waived his rights voluntarily, knowingly, and intelligently.  Of particular note to this Court, the record reflects as follows: Defendant was informed of his *Miranda* rights by the officers; Defendant orally consented to speak with the officers in light of his rights; at the conclusion of the interrogation Defendant confirmed that he made his statements after hearing his *Miranda* rights and acting under his own free will; the interrogation was only approximately one hour in length; the officers maintained a conversational tone and did not threaten Defendant; and at all times Defendant tracked the questions and answered appropriately.

At the end of the interrogation, Defendant stated that he was suicidal. But, Defendant also expressed significant remorse for his actions in both interviews and his suicidal ideation does not stem from coercive police activity.  Also, there is no indication in the record that Defendant was confused, not of clear mind, lacked volition, or

otherwise mentally adversely affected notwithstanding his oral expression of suicidal ideation. On the contrary, Defendant's statements were clear, freely made, and manifested an understanding of the adverse factual predicament and potential consequences he faced. Therefore, this Court does not conclude that Defendant's suicidal ideations render his statement on July 28, 2011, to be involuntary. *See United States v. Galceran*, 301 F.3d 927, 931 (8th Cir. 2002); *United States v. Cody*, 498 F.3d 582, 588 (6th Cir. 2007).

### C. Motion to Dismiss Indictment: Lack of Nexus with Interstate Commerce (Docket No. 11)

Defendant is indicted for violation of 18 U.S.C. § 2251(a), which states, in relevant part, as follows:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, . . . with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct . . . , shall be punished as provided under subsection (e), . . . if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, . . . .

Defendant moves to dismiss the Indictment, arguing that the allegation that criminal visual depictions were manufactured using equipment that had at some point crossed state lines to get to Minnesota constitutes an inadequate impact on interstate commerce to

allow federal jurisdiction to attach to this case.[6]  For the reasons set forth below, this Court recommends that Defendant's motion to dismiss be denied.

Defendant's motion can be denied for two reasons. First, as Defendant acknowledges, the constitutionality of Congress's proscription of the "use of materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means" in the manufacturing of child pornography is well settled within the Eighth Circuit. *See United States v. Pliego*, 578 F.3d 938, 944 (8th Cir. 2009) (holding that defendant's argument that § 2251(a) exceeds Congress's authority under the Commerce Clause is without merit" because of the abundance of prior precedent on this issue); *United States v. Nichols*, 574 F.3d 633, 637 (8th Cir. 2009) (holding "this court has upheld the constitutionality of § 2251 and has held on a number of occasions that the use of equipment that has moved in interstate commerce provides a sufficient jurisdictional nexus to include the production of child pornography under the Commerce Clause"); *United States v. Betcher*, 534 F.3d 820, 824 (8th Cir. 2008) (holding that "[m]ore than one panel of [the Eighth Circuit Court of Appeals] has already rejected this precise constitutional attack" to § 2251(a)). As Defendant acknowledges, the very argument that he raises in the present motion was rejected in *United States v. Lemke*, 377 Fed. Appx. 570 (8th Cir. 2010).

Second, Defendant's proffered application of the United States Supreme Court's holding in *Gonzalez v. Raich*, 545 U.S. 1, 125 S.Ct. 2195 (2005), is erroneous.[7]  The

---

[6] The parties stipulated that Defendant's Motorola Android cellular telephone was produced in China and moved in interstate commerce. *See* Docket Nos. 23, 31.

Commerce Clause grants Congress the power "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." U.S. Const. art. I, sec. 8, cl. 3.  The United States Supreme Court has explained:

> The Commerce Clause reaches, in the main, three categories of problems. First, the use of channels of interstate or foreign commerce which Congress deems are being misused, as, for example, the shipment of stolen goods (18 U.S.C. §§ 2312-2315) or of persons who have been kidnapped (18 U.S.C. § 1201). Second, protection of the instrumentalities of interstate commerce, as for example, the destruction of an aircraft (18 U.S.C. § 32), or persons or things in commerce, as, for example, thefts from interstate shipments (18 U.S.C. § 659). Third, those activities affecting commerce.

*Perez v. United States*, 402 U.S. 146, 150, 91 S. Ct. 1357, 1359 (1971). In *Raich*, the Supreme Court explained that, under Congress's ability to regulate activities affecting interstate commerce, Congress has the power "to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." 545 U.S.  at 17, 125 S.Ct. at 2206. In *Raich*, the Supreme Court upheld a challenge to Congress's regulation of marijuana cultivation because the regulation was an "'essential part of a larger regulation of economic activity [(i.e., the regulation of controlled substances)], in which the regulatory scheme could be undercut unless the intrastate activity were regulated.'" 545 U.S. at 25, 125 S.Ct. at 2210 (quoting *Lopez*, 514 U.S., at 561, 115 S.Ct. 1624). In reaching this conclusion, the Court distinguished its holding in *Raich* from cases in which the Court held that Congress exceeded its

---

[7] In reaching this conclusion, this Court finds significant persuasive support in *United States v. Lemke*, Criminal No. 08-216(1) (DWF/RLE), 2008 WL 4999246 (D. Minn. Nov. 19, 2008).

Commerce Clause power by regulating guns in school zones[8] and gender-motivated violence[9], which were only regulations of "the noneconomic, criminal nature of the conduct at issue." 545 U.S. at 25, 125 S.Ct. at 2210. (quoting *Morrison*, 529 U.S., at 610, 120 S.Ct. 1740).

Defendant interprets the above and similar language quite narrowly and advocates a twofold Commerce clause analysis for this Court: The Court must, first, consider whether the regulated activity has a substantial effect on interstate commerce. Second, the Court must consider whether the regulated activity is an "economic activity" or a "criminal activity." If the Court determines that the regulated activity is a "criminal activity," then the regulation exceeds Congress's power under the Commerce Clause. Defendant contends that, under this proffered analysis, because the sexual molestation of a minor is a criminal activity and not an economic activity, the production of child pornography stemming from sexual molestation cannot constitute an "economic activity" and, as such, cannot be regulated under the Commerce clause.

The twofold Commerce clause analysis proposed by Defendant has no basis in *Raich*.   In *Raich*, the United States Supreme Court rejected the argument that the "categorical prohibition of the manufacture and possession of marijuana as applied to the intrastate manufacture and possession of marijuana for medical purposes pursuant to California law exceeds Congress' authority under the Commerce Clause."  545 U.S. at 15, 125 S. Ct. at 2205.  In rejecting this argument, the United States Supreme Court

---

[8] *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624 (1995).

[9] *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740 (2000).

explained that "[a]s [the Court] stated in *Wickard*, 'even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce.'" *Raich*, 545 U.S. at 17, 125 S.Ct. at 2206 (quoting *Wickard v. Filburn*, 317 U.S. 111, 125, 63 S.Ct. 82 (1942)).  Applying this precedent, the United States Supreme Court rejected the argument presented because "[l]ike the farmer [of wheat] in *Wickard*, respondents are cultivating, for home consumption, a fungible commodity [(i.e., marijuana)] for which there is an established, albeit illegal, interstate market." 545 U.S. at 19, 125 S.Ct. at 2207. Having reached this conclusion, the Supreme Court explained that unlike the regulation of guns in school zones and gender-motivated violence, the manufacture and possession of marijuana with the broader regulation of controlled substances is a "quintessentially economic" regulation because "[e]conomics" refers to "the production, distribution, and consumption of commodities." *Id.* at 26, 125 S. Ct. at 2211 (quoting Webster's Third New International Dictionary 720 (1966)).

Thus, in *Raich*, the United States Supreme Court was not creating silos of criminal activity versus economic activity. Rather, the Supreme Court was distinguishing constitutional regulations that define and prohibit a criminal activity that has a substantial effect on interstate commerce from the unconstitutional regulations that only define and prohibit a criminal activity with nothing more than an attenuated effect on interstate commerce. The Supreme Court concluded that cultivation of marijuana was the former type of regulation.

Likewise, there is no question that the production of child pornography "using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means" constitutes the former type of regulation rather than the latter.[10]  Defendant is not being prosecuted for the sexual molestation of a child nor is he being prosecuted for engaging in a sexual act using an item that traveled in interstate commerce.  A plain reading of 18 U.S.C. § 2251(a) supports that Defendant is being prosecuted for violating the regulated activity of manufacturing a class of prohibited images, for which there is an interstate market, by particular means, using particular materials that have traveled through interstate commerce.  Thus, Defendant is being prosecuted for engaging in an activity that "exerts a substantial economic effect on interstate commerce," which is well within Congress's power to regulate pursuant to Article I, Section 8, Clause 3 of the United States Constitution.

Therefore, for the reasons set forth above, this Court concludes that this Court has jurisdiction to prosecute the underlying Indictment (Docket No. 1); thus, this Court recommends that Defendant's motion to dismiss be denied.

---

[10] *See United States v. Mugan*, 394 F.3d 1016, 1023 (8th Cir. 2005) (holding that "[t]he extent of the interstate market for child pornography described by Congress and its dependence upon locally produced materials demonstrate that the intrastate production and possession of child pornography is an economic activity connected to interstate commerce"); *see also Betcher*, 534 F.3d at 824 n.3 (explaining that "the *Mugan* judgment was vacated because of *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), but the discussion concerning the constitutionality of the child pornography statutes is nonetheless persuasive.").

IV.

Based upon the foregoing Findings and Conclusions, the undersigned Magistrate Judge makes the following:

**RECOMMENDATION**

For the reasons set forth herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Docket No. 9) be **DENIED**;

2. Defendant's Motion to Suppress Statements, Admissions, and Answers (Docket No. 10) be **DENIED**; and

3. Defendant's Motion to Dismiss Indictment: Lack of Nexus with Interstate Commerce (Docket No. 11) be **DENIED**.

Dated: March 16 , 2012

         *s/ Tony N. Leung*
        Magistrate Judge Tony N. Leung
        United States District Court
        for the District of Minnesota
        CASE NO. 11CR380 (DWF/TNL)

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before **March 31, 2012**.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within ten days of receipt of the Report.